UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TERRI FREDERICKS,

                              Plaintiff,

         -v-                                              5:05-CV-1344 (LEK/ RFT)

HARTFORD LIFE INSURANCE
COMPANY,

                              Defendant.
_____

## MEMORANDUM-DECISION AND ORDER

Plaintiff Terri Fredericks commenced this action on October 25, 2005, against Defendant

Hartford Life Insurance Company, pursuant to the Employee Retirement Income Security Act of

1974 as amended ("ERISA"), 28 U.S.C. § 1132.  Compl. (Dkt. No. 1).[1]  Plaintiff asserts two claims:

that Defendant wrongfully terminated Plaintiff's long term disability benefits and that Defendant

breached its fiduciary duty to Plaintiff.  Both parties have moved for summary judgment on the

administrative record, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons

discussed below, Defendant's Motion is granted and Plaintiff's motion is denied.

I.       BACKGROUND

A.       Plaintiff's Long Term Disability Policy with Defendant

In November 2001, Plaintiff was employed by Univera Healthcare-CNY, Inc., now known

as Health Services Medical Corporation of Central New York. Inc., as a medical secretary.  Compl.

¶ 7.  Incidental to her employment, she was covered under the terms of the Group Insurance Policy

_____

[1] While Plaintiff's Complaint named three additional Defendants, those Defendants were
dismissed by stipulation on November 7, 2007.  Dkt. No. 26.

("Policy") issued by Defendant to Health Services Medical Group.  See Policy at 3 (Dkt. No. 33,

Attach. 2).

The Policy provides long term disability benefits for eligible employees of Health Services

Medical Group during periods that such employees are disabled (as that term is defined in the

policy), after the Elimination Period prescribed in the Policy, and as long as the claimant provides

Defendant with satisfactory proof that the claimant remains disabled.  See generally Policy.

The Policy defines "disability" or disabled" as meaning that

[D]uring the Elimination Period and for the next 24 months you are prevented by:
(1) accidental bodily injury;
(2) sickness;
(3) Mental Illness;
(4) Substance Abuse; or
(5) pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result
your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability
Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of
Any Occupation.

. . . .

Policy at 6.  The Policy defines "Essential Duty" as a duty that "1. is substantial, not incidental; 2. is

fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed."  Id.

The Policy defines "Your Occupation" as "your occupation as it is recognized in the general

workforce . . . [and] does not mean the specific job you are performing for a specific employer or at

a specific location."  Id. at 12.

A claimant's entitlement to benefits is conditioned, inter alia, upon the claimant's providing

satisfactory Proof of Loss to Defendant.  Policy at 19.  Under the Policy,

2

Proof of Loss may include but is not limited to the following:

1.    documentation of:
      a)    the date your Disability began;
      b)    the cause of your Disability;
      c)    the prognosis of your Disability;
      d)    your Earnings or income . . . ; and
      e)    evidence that you are under the Regular Care of a physician;
2.    any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;

. . .

All proof submitted must be satisfactory to us.

Policy at 25. Proof of loss must be sent within 30 days after the start of the period for which Defendant owes payment, and Defendant "may require, at reasonable intervals, additional written Proofs of Loss throughout [the claimant's] Disability." Id. If the claimant fails to provide timely proof of loss, such failure will not affect the claim if "it was not possible to give proof within the required time" and "Proof of Loss is given as soon as possible." Id.

Benefits terminate at the first of various occurrences, including "the date [the claimant is] no longer Disabled as defined [in the Policy]" or "the date [the claimant] fail[s] to furnish Proof of Loss, when requested by [Defendant]." Policy at 20. The Policy provides that Defendant has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Id. at 28.

**B.    Plaintiff's Illness and Claim for Benefits**

In August 2001, Plaintiff discovered a lump in her upper leg. Administrative Record ("AR") at 329. As a result, Plaintiff underwent inpatient chemotherapy treatments. Id. Plaintiff underwent surgery on February 19, 2002, and the surgeon removed a large soft tissue mass from

3

Plaintiff's left buttock.  Id. at 321.  Plaintiff last worked on November 13, 2001.  Id. at 329.

In February 2002, Plaintiff applied to Defendant for long term disability benefits under the Policy.  AR at 326-34.  Defendant approved Plaintiff's benefits claim in a letter dated April 12, 2002.  Id. at 301-03.  Defendant calculated Plaintiff's disability date as November 14, 2002, and Plaintiff's benefits became effective retroactive to January 13, 2002 (upon conclusion of the 60 day elimination period).  Id. at 303.

Subsequent to the approval of Plaintiff's long term disability benefit claim, Defendant's claims examiner periodically reviewed Plaintiff's condition to assess whether she continued to qualify for benefits under the Policy.  See generally AR.  In March 2003, Defendant's claims examiner sent a letter to Plaintiff's treating physician, Dr. Timothy Damron, M.D., requesting that Dr. Damron provide Defendant with office notes for the previous six months, including any test reports, and that Dr. Damron complete a Physical Capacities Evaluation Form for Plaintiff.  Id. at 269.  Dr. Damron provided the requested information.  Id. at 160-74.  On July 17, 2003, Defendant's claims examiner sent a letter to Dr. Damron seeking office notes and test reports for Plaintiff since March, as well as an updated Physical Capacities Evaluation Form.  Id. at 149.  The claims examiner also sent a letter to Plaintiff on July 17, 2003, notifying her of the request sent to Dr. Damron, and asking that she "contact Dr. Damron to ensure the requested medical information is submitted to our office by August 7, 2003."  Id. at 18.  However, Defendant did not receive any response from Dr. Damron or Plaintiff with regard to its July 17, 2003 letters.

On August 13, 2003, the claims examiner sent another letter to Plaintiff advising her that no response had been received from Dr. Damron relative to the July 17, 2003 letter.  AR at 17.  The claims examiner requested that Plaintiff contact Dr. Damron's office and ensure that responsive

information be provided within 30 days.  Id.  Defendant did not receive any response from Plaintiff.

On September 16, 2003, the claims examiner sent another letter to Plaintiff, noting that Defendant

had not received any response to the July 17, 2003 letter to Dr. Damron, and had not received any

response to the letters sent to Plaintiff on July 17, 2003 or August 13, 2003.  Id. at 16.  This letter

stated that "we ask that you contact Dr. Damron to ensure the requested medical information is

submitted to our office by October 16, 2003 or we will have no alternative but to terminate your

LTD claim."  Id.  Neither Plaintiff nor Dr. Damron responded to the letter.  On October 21, 2003,

the claims examiner sent a letter to Plaintiff, notifying her that her long term disability benefits had

been terminated as of September 30, 2003.  Id. at 150-53.  The letter included the Policy language

regarding both the Proof of Loss that claimants are required to provide as well as when benefits will

terminate.  Id.  The letter stated that

> We have not received any of the requested medical information [from July 2003] in our
> office as of today from Dr. Damron. . . .Your lack of response and the lack of medical
> information hinder our ability to determine whether you continue to satisfy the provisions of
> the LTD policy beyond September 30, 2003.  Because of this, your LTD benefits must be
> terminated beyond September 30, 2003.

Id. at 152.  The claims examiner's letter also noted what information Plaintiff needed to submit in

order for Defendant to make a determination concerning Plaintiff's long term disability

benefit claim:

> Dr. Damron's office notes/test reports on you since March 8, 2003 and his
> completed Physical Capacities Evaluation Form on you. That information is necessary to
> determine if you remain Totally Disabled (as defined in you LTD policy) beyond
> September 30, 2003.

Id.

On October 22, 2003, Defendant received Dr. Damron's June 2, 2003 and August 25, 2003

reports concerning his examination of Plaintiff.  AR at 137-42.  On June 2, 2003, Dr. Damron

examined Plaintiff for her fifteen month postoperative appointment.  Id. at 141-42.  Dr. Damron

noted that Plaintiff reports "she is doing fine," and that a physical examination of Plaintiff revealed

no abnormalities.  Id.  On August 25, 2003, Dr. Damron reported that Plaintiff "is doing very well,"

although she still used a cushion "because of the discomfort over the ischium where she has no

further bone to sit on."  Id. at 139.

Dr. Damron also provided a completed Physical Capacities Evaluation Form (dated October

15, 2003).  AR at 137-38.  In that Form, Dr. Damron asserted that Plaintiff could, in an eight-hour

workday, sit for three to four hours (no more than one hour at a time), stand for four to five hours

(up to two hours at a time), walk for two to three hours (no more than one hour at a time), drive for

three to four hours (no more than one hour at a time), and suggested that Plaintiff could work up to

three to four hours per day.  Id. at 137.  Dr. Damron stated that Plaintiff required a pillow to sit on

when performing work, but otherwise did not report any environmental restrictions on Plaintiff's

abilities.  Id. at 138.  Dr. Damron concluded that Plaintiff's symptoms were unlikely to change but

that she could return to work on November 1, 2003 with the restrictions stated in the Physical

Capacities Evaluation Form.  Id.

In a letter dated November 11, 2003, the claims examiner requested that Dr. Damron

provide clarification of the information he provided in October.  AR at 9-10.  The claims examiner

noted that Dr. Damron's "August 25, 2003 assessment was that [Plaintiff] has no evidence of

disease; however, your October 15, 2003 Physical Capacities Evaluation Form states [Plaintiff] is

not able to return to work until November 1, 2003 and at only 3-4 work hours per day . . . we find

additional information is needed to evaluate [Plaintiff's] eligibility for benefits beyond September

30, 2003." Id. at 9.  The claims examiner requested that Dr. Damron provide

> a brief narrative report on [Plaintiff], provid[ing] your opinion [as to] whether or not
> [Plaintiff] was able to perform the essential duties of a Medical Secretary, on a full time
> basis, as of October 1, 2003. If your opinion is that [Plaintiff] was not able to [do so] . . . ,
> we ask that you provide us with the clinical data/findings that support your opinion . . . .

Id. at 9.

By a letter dated November 14, 2003, Dr. Damron responded to the request for a narrative

report concerning Plaintiff.  AR at 135-36.  Dr. Damron stated that Plaintiff still "used her C

cushion but that because of discomfort over the ischium where she has no further bone to sit on, it is

still difficult for her to sit," and "requires frequent changes in position."  Id. at 135.  Dr. Damron did

not respond to the specific question of "whether or not [Plaintiff] was able to perform the essential

duties of a Medical Secretary, on a full time basis, as of October 1, 2003" and, if not, what clinical

data/findings support this conclusion.

Defendant then referred the matter for an independent medical record review to Dr. William

Sniger, M.D.  AR at 127-30, 133-34.  In his review, Dr. Sniger reviewed Plaintiff's medical records

as well as the job requirements for medical secretary, as provided to him by Defendant.  Id. at 127,

133, 143-44.  Dr. Sniger also had a telephone conference with Dr. Damron, as reflected in Dr.

Sniger's February 4, 2004 letter to Dr. Damron.  Id. at 131-32.  The letter stated that "You (Dr.

Damron) opined that [Plaintiff] has the functional capacity to perform her job as a medical secretary

with restrictions of provision of a seat cushion, frequent changes of position and ability to get up

and periodically move around."  Id. at 131.  Dr. Sniger requested that Dr. Damron review his letter

and stated that if he did not hear from Dr. Damron within five business days, that he would "assume

that you essentially agree with my understanding of our conversation."  Id. at 132.  Dr. Damron did

not respond to the letter.

In his Medical Report to Defendant dated February 4, 2004, Dr. Sniger concluded that "[b]ased upon my review of the medical record and my conversation with the claimant's physician, it is my opinion that the claimant has the functional capacity to perform her own sedentary work. Restrictions consist of periodic changes of position and alternating sitting with standing." AR at 134.

On March 2, 2004, the claims examiner sent Plaintiff a letter stating that Plaintiff did not satisfy the definition of disability provided by the Policy, and that therefore, it was still the determination of Defendant that Plaintiff's entitlement to long term disability benefits had terminated, effective September 30, 2003. AR at 122-25. The benefit termination letter noted that the benefit claim decision was based on the Policy language and all of the documents in Plaintiff's administrative claim file, including, inter alia, Dr. Damron's Physical Capacities Evaluation Form, dated October 15, 2003; the Occupational Description for the position of Medical Secretary; Dr. Damron's November 14, 2003 letter to Hartford Life; Dr. Damron's office notes and records from June 2 through August 25, 2003; and the independent medical record review completed by Dr. Sniger. Id. at 123. The letter addressed the issue of Plaintiff's entitlement to benefits as follows:

> Dr. Damron's August 25, 2003 office note states that you are doing very well . . . Dr. Sniger's February 4, 2004 report states that he spoke with Dr. Damron and Dr. Damron opined that you have the functional capacity to perform your own work as a Medical Secretary, with restrictions of allowance for usage of a seat cushion/frequent changes of position and ability to get up periodically/move around. Dr. Sniger states that he feels these accommodations are reasonable and that based on his review of the medical record and his conversation with your physician, it is his opinion that you have the capacity to perform your own sedentary work.

. . .

> The combined information in your file does not show that you are unable to perform the
> Essential Duties of Your Occupation on a full time basis beyond September 30, 2003.

Id. at 124.

On April 16, 2004, Plaintiff wrote to Defendant to appeal Defendant's decision to terminate

her long term disability benefits.  AR at 116.  In her appeal letter, Plaintiff asserted that Dr. Damron

had confirmed his opinion that Plaintiff is "totally and permanently disabled."  Id.  Plaintiff also

stated that her position as a medical secretary involved "mostly sitting" and that her surgery had left

her "unable to sit for any length of time," and that "[s]itting is not a comfortable thing to do."  Id.

Plaintiff confirmed that she "must always sit on a soft cushion, and them I am constantly shifting

around and standing up to stretch, and lying down at times."  Id.

In conjunction with Plaintiff's appeal, Plaintiff included a letter by Jaclyn Jackson, a

Physician Assistant in Dr. Damron's office.  AR 111.  Ms. Jackson confirmed that "[s]ince the time

of [Plaintiff's] surgery the patient has not been able to sit for any length of time without a

considerable amount of pain . . . She must make frequent positional changes and use a C-cushion in

order to sit for minimal amount of time."  Id.  Ms. Jackson concluded that "it is felt that the patient

is disabled."  Id.

Defendant assigned Plaintiff's appeal to one of its appeals specialists.  AR at 113.  The

appeals specialist referred Plaintiff's claim for a second medical record review.  Id. at 107-08.  The

medical record review was conducted by Dr. Andrea Wagner, M.D.  Id. at 76.  As part of her

review, Dr. Wagner spoke with Dr. Damron on May 24, 2004.  Id. at 68.  Dr. Damron noted that he

last evaluated Plaintiff in June 2003, concluding that Plaintiff "had no evidence of active disease"

9

and that "there are no plans for further treatment." Id.  Dr. Damron confirmed that Plaintiff

complained of pain when sitting and that, with regard to Plaintiff's functionality, "he only had

[Plaintiff's] self report upon which to base his functional assessment." Id.

Dr. Wagner issued her report on June 1, 2004.  AR at 62-71.  Dr. Wagner noted that

Plaintiff "has been free of recurrent disease" since her surgery and post-operative chemotherapy.  Id.

at 69.  Dr. Wagner also concluded that

> [t]he record documents that [Plaintiff] has experienced discomfort with sitting. Dr. Damron
> in his note does not clarify why [Plaintiff] would not be able to perform a sedentary
> occupation with limitations on sitting and the ability to change posture when needed.
> As [Plaintiff] has no evidence of active disease, and no current treatment plan, there is no
> evidence other than [Plaintiff's] own self report that would indicate that her present
> condition is significantly affecting her functional level.
>
> . . .
>
> Dr. Damron could not cite any medical evidence that would require any other substantial
> restrictions or limitations upon [Plaintiff's] activity other than limited sitting and the ability
> to change posture when needed. Dr. Damron did not outline any evidence of impairment or
> condition that would require any other substantial functional restrictions on [Plaintiff's]
> activity level. In summary, based on all the available evidence as of 3/1/04 and beyond,
> [Plaintiff] is functional at a full-time basis at a sedentary level with the restriction of limited
> sitting and the ability to change posture when needed.

Id. at 69-71.

In addition to her report to Defendant, Dr. Wagner also prepared a letter to Dr. Damron

summarizing their conversation, confirming that there were no current plans for further treatment,

and that Plaintiff had "a good chance of cure."  AR at 72-73.  Dr. Wagner's letter also referred to

Dr. Damron's statement "that [Plaintiff] stated to you that she is unable to do sedentary work, as she

had difficulty sitting," and Dr. Damron's confirmation that his only basis for Dr. Damron's

functional assessment was Plaintiff's self report.  Id. at 73.  Dr. Wagner requested that Dr. Damron

review her letter and stated that "[i]f you elect not to respond [within one week], the insurer may rely on this summary in its current form."  Id.

Dr. Damron submitted written comments concerning Dr. Wagner's letter, stating that while there were no current treatment plans, Plaintiff "should be seen for routine surveillance."  AR at 85.  In response to Dr. Wagner's statement that Dr. Damron "only had [Plaintiff's] self report as a basis for [his] functional assessment," Dr. Damron stated that "this is not the only basis; this assessment is also based upon her medical history . . . [and Plaintiff's] local tenderness [due to her surgery] that is an obvious problem for sitting."  Id. at 86.

Following receipt of Dr. Wagner's report, the appeals specialist sought clarification of how Plaintiff's sitting would be limited if she returned to work full-time.  AR at 92.  Dr. Wagner responded to Mr. Connor's request for clarification by stating that "[s]itting is limited only in the ability to change posture as needed."  Id. at 91.

The appeals specialist also solicited the input of a Vocational Rehabilitation Counselor, Joan Antczak, MS, CRC, noting that Plaintiff was a medical secretary, and noting that Dr. Wagner's medical report "indicates that [Plaintiff] is capable of full time sedentary work with the ability to change posture as needed."  AR at 87.  The appeals specialist asked Ms. Antczak if "the occupation of medical secretary as it is performed in the general workplace [would] allow [Plaintiff] to change posture as needed?"  Id.  Ms. Antczak responded that

> [a]lthough the occupation of Medical Secretary . . . is sedentary in nature . . . , the tasks involved in performing the occupation are varied which would allow for frequent posture changes throughout an employee's work day . . . It is also reasonable to expect that most employers in the general workplace will allow an employee to change posture as needed as well as to take intermittent breaks for standing and walking as needed.

Id. at 77-78 (referring to Id. at 81-83).

11

Thereafter, the appeals specialist sought further clarification of Dr. Wagner's report, asking Dr. Wagner if the limitations outlined in her June 1, 2004 report had been in effect as of October 1, 2003.  AR at 76.  In response to this clarification request, Dr. Wagner stated that, as of October 2003, Plaintiff "had been free of disease for over one year" and that she had "no evidence of active disease and had completed treatment by that time. Therefore, there is no indication in the record that [Plaintiff] required any additional restrictions or limitations on her functionality."  Id. at 49.

The appeals specialist issued his appeal determination on June 18, 2004, upholding the decision to terminate Plaintiff's long term disability benefits under the Policy as of September 30, 2003 because "satisfactory proof of continued disability beyond 9/30/03 has not been provided." AR at 52-55.  The appeals specialist referred to Plaintiff's appeal letter, the previous determination letters from Defendant, as well as the following additional documents: (1) the letter from Jaclyn Jackson, PA-C; (2) Dr. Wagner's medical record review; (3) a telephone consultation summary signed by Dr. Damron on June 2, 2004; (4) Dr. Wagner's e-mail clarification regarding her medical record review; (5) the information provided by Defendant's Vocational Rehabilitation Counselor; and (6) Dr. Wagner's addendum to her medical record review.  Id. at 52.  Based on all of this information, the appeals specialist concluded that Plaintiff was no longer entitled to long term disability benefits under the Policy, stating that "[a] medical review of the evidence contained in your file finds that you are capable of performing full time sedentary work if you have the ability to change posture when needed. This would not preclude you from performing your occupation as it is performed in the general workplace."  Id. at 54.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper

when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c); Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A court must "'resolve all ambiguities, and credit all

factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment.'" Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. General

Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)). However, "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Here, the parties agree that there are no disputes as to material facts in this case, and that

adjudication of the legal issues on summary judgment is appropriate. Defendant and Plaintiff have

each submitted a Statement of Undisputed Material Facts that mirrors that of the other party. Def.'s

Statement of Material Facts (Dkt. No. 33, Attach. 3); Pl.'s Statement of Material Facts (Dkt. No. 38,

Attach. 2).

## III.    DISCUSSION

## A.    Standard of Review under ERISA

While ERISA does not specify what standard of review a court should apply when presented

with a challenge to a plan administrator's denial of benefits, the Supreme Court has held that such

challenges are "to be reviewed under a de novo standard of review unless the benefit plan gives the

administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of

the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When the "plan

documents confer upon a plan administrator the discretionary authority to determine eligibility," a

court should overturn the administrator's conclusions only if they are arbitrary or capricious.  Pagan

v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995) (citations omitted).

Here, the Policy documents clearly confer upon Defendant the discretionary authority to

determine Plaintiff's eligibility for benefits.  Under the heading "General Provisions" and the

subheading "Who interprets policy terms and conditions?," the Policy states that "We have full

discretion and authority to determine eligibility for benefits and to construe and interpret all terms

and provisions of the Group Insurance Policy."  Policy at 28.

Plaintiff concedes that the Policy confers discretionary authority upon Defendant to deny

benefits, and that Firestone Tire would ordinarily lead the Court to apply the arbitrary or capricious

standard of review.  Yet Plaintiff, relying on Nichols v. The Prudential Insurance Co. of America,

406 F.3d 98 (2d Cir. 2005), argues that de novo review is appropriate in this case, because

Defendant has violated a fiduciary duty to Plaintiff.  However, the Court does not read Nichols to

require de novo review in any case where a plan administrator allegedly violated a fiduciary duty to

claimant.  Rather, the Second Circuit in Nichols held that even if a plan vests discretion in the plan

administrator, a deferential standard of review only applies to cases where the administrator made

an actual exercise of discretion.  406 F.3d at 109.  By contrast, de novo review would be appropriate

where a claim was denied due to inaction by the administrator, such as where a claim was deemed

denied by operation of law after the passage of a given number of days after the claimant's appeal to

the administrator.  406 F.3d at 109-10.  Here, Defendant exercised its discretion through its initial

claim termination notice on October 21, 2003, its reaffirmation of that determination on March 2,

2004, and its appellate decision on June 18, 2004 upholding that determination.  That exercise of

discretion is subject to arbitrary and capricious review by this Court.

14

Under the applicable arbitrary and capricious standard of review, a reviewing court "must grant significant deference to the plan administrator's determination." Armstrong v. Liberty Mut. Life Assur. Co. of Boston, 273 F. Supp. 2d 395, 403 (S.D.N.Y. 2003) (citing Schwartz v. Newsweek, Inc., 827 F.2d 879 (2d Cir. 1987). A court must determine "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Jordan v. Retirement Committee of Rensselaer Polytechnic Institute, 46 F.3d 1264, 1271 (2d Cir. 1995) (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)). A court must uphold the plan administrator's termination of a claimant's benefits unless that determination was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan, 52 F.3d at 442 (quotations omitted). Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting Sandoval v. Aetna Life and Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)). When applying the arbitrary and capricious standard of review, the reviewing court is confined to consideration of the administrative record utilized by the administrator to make the benefit claim decision. Miller, 72 F.3d at 1071.

**B.     Plaintiff's Claim for Benefits Under ERISA § 502(a)(1)(B)**

Plaintiff's first claim is brought pursuant to section 502(a)(1)(B) of ERISA, to recover benefits claimed under the terms of the long term disability Group Insurance Policy. See Compl. ¶¶ 8-16. Section 502(a)(1)(B) provides:

A civil action may be brought . . . by a participant or a beneficiary . . . to recover benefits

> due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  The burden of proving an entitlement to benefits rests with the

individual claiming the benefit.  See Paese v. Hartford Life and Accident Ins. Co., 449 F.3d 435,

441 (2d Cir. 2006) (citations omitted); Mario v. P&C Food Markets, Inc., 313 F.3d 758, 765 (2d

Cir. 2002).

Plaintiff argues that her continued discomfort while sitting renders her disabled within the

meaning of the Policy, and that Defendant's determination to the contrary was arbitrary and

capricious, and not supported by substantial evidence.  However, the record does not show that

Defendant reached its conclusions arbitrarily, or without a thorough review of Plaintiff's medical

record.  After neither Plaintiff nor her treating physician, Dr. Damron, replied to Defendant's

requests for information from July to September 2003 as to Plaintiff's continued eligibility for

benefits, Defendant exercised its rights under the Policy when Defendant terminated Plaintiff's

benefits on October 21, 2003.  See AR at 150-53.  However, after Dr. Damron provided the

requested information later in October, Defendant reviewed that information and corresponded with

Dr. Damron, seeking clarification of his conclusion that Plaintiff could only work up to four hours

per day.  Defendant's termination decision on March 2, 2004, as well as its June 18, 2004 appellate

decision upholding its earlier decision, both reference information concerning Plaintiff provided by

Dr. Damron as well as Defendant's medical record reviewers, Dr. Sniger and Dr. Wagner.  Id. at

52-55, 122-25.  The administrative record shows that Dr. Sniger and Dr. Wagner reviewed the

medical records supplied by Dr. Damron, and contacted Dr. Damron to clarify the basis for his

conclusion that Plaintiff was not able to resume full-time employment.

16

Plaintiff argues that Defendant should have afforded more weight to the opinion of Plaintiff's treating physician, Dr. Damron–due to Dr. Damron's special familiarity with Plaintiff's condition–in contrast to the opinions of Defendant's medical record reviewers who have never examined Plaintiff.  Yet the Supreme Court has held that in the ERISA context, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." Black and Decker Disability Plan v. Nord, 538 U.S. 822, 123 S.Ct. 1965, 1967 (2003).  As ERISA and its accompanying regulations "do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition," Id., Defendant did not err by according no special weight to the opinions of Plaintiff's treating physician.  Courts may not "impose on plan administrators a discrete burden of explanation when [the administrators] credit reliable evidence that conflicts with a treating physician's evaluation." Id. at 1972.

Moreover, the record does not show that Defendant ignored the opinions of Plaintiff's treating physician; rather, Defendant weighed the opinions of Dr. Damron in conjunction with the other evidence in the record, and determined that Dr. Damron was incorrect in his conclusion that Plaintiff could only return to work part time.  To the extent Defendant relied upon the opinions of its consultants rather than Dr. Damron, "the mere existence of conflicting evidence does not render the [administrator's] decision arbitrary and capricious." Robbins v. Laberge Engineering & Consulting Ltd., 2005 WL 2039195, *9 (N.D.N.Y. Aug. 24, 2005) (quoting Rosario v. Local 32B-32J, 2001 WL 930234, *4 (S.D.N.Y. Aug. 16, 2001)); see Pava v. Hartford Life and Accident Insurance Co., 2005 WL 2039192 (E.D.N.Y. Aug. 24, 2005) ("decision to deny ERISA benefits is neither arbitrary or capricious where it is 'essentially a decision to value the opinion of [defendant's] independent physician above the opinion of [p]laintiff's physician'") (quoting Solaas

v. Delta Family-Care Disability and Survivorship Plan, 2005 U.S. Dist. LEXIS 5269, *8 (S.D.N.Y. March 29, 2005)).

The record shows that Dr. Damron agreed with Dr. Sniger and Dr. Wagner that Plaintiff would be able to return to work with the restriction that she be permitted to sit on a cushion, be allowed frequent changes in position, and allowed breaks when necessary.  The crux of the disagreement between Dr. Damron and Defendant's medical record reviewers was whether Plaintiff could work only part time (as argued by Dr. Damron) or full time (as argued by Dr. Sniger and Dr. Wagner).  The Court's role is not to determine which of these conclusions was correct, but rather to assess whether Defendant acted reasonably when it relied upon the opinion of Dr. Sniger in determining that Plaintiff could resume full-time employment, and later relied upon the opinion of Dr. Wagner in upholding its earlier decision.

There is substantial evidence in the record to support Defendant's conclusion that Plaintiff could perform the occupation of medical secretary, full time, as it is performed in the general workplace, as long as she was accorded reasonable accommodations; and that therefore, Plaintiff had not submitted satisfactory proof of her continued disability beyond September 30, 2003.  This evidence is not limited to the reports of Defendant's medical record reviewers, but also includes the information provided by Dr. Damron that Plaintiff was doing well and had been free of active disease since June 2003; Dr. Damron's conclusion that Plaintiff would need no other environmental accommodation other than a cushion if she returned to work; and the conclusions of the Vocational Rehabilitation Counselor that it is reasonable to expect most employers to allow an employee to change posture and take intermittent breaks for standing and walking, as needed.  Notably, Plaintiff does not challenge the Vocational Rehabilitation Counselor's conclusions.

18

The Court concludes that there is ample support in the record for Defendant's determination that Plaintiff failed to demonstrate that her continued discomfort while sitting would prevent her from performing one or more essential duties of the occupation of medical secretary.  Therefore, the Court grants summary judgment to Defendant on this claim.  See, e.g., Robbins, 2005 WL 2039195 (granting summary judgment to insurer whose denial of benefits relied upon, inter alia, medical records reviews that differed from conclusions of claimant's treating physician).

**C.    Plaintiff's Claim for Breach of Fiduciary Duty under ERISA § 502(a)(3)**

Plaintiff's second claim is brought pursuant to section 502(a)(3) of ERISA.  Plaintiff alleges that Defendant breached its fiduciary duty to Plaintiff by Defendant's wrongful denial of benefits as well as Defendant's failure to provide Plaintiff with her claim file and a copy of Dr. Sniger and Dr. Wagner's reports until after Defendant's final determination of Plaintiff's appeal.  See Compl. ¶¶ 17-24.

Section 502(a)(3) of ERISA provides a catch-all provision allowing a plaintiff to assert a cause of action for breach of fiduciary duty:

> A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).  In Varity Corp. v. Howe, the Supreme Court explained that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief [under 29 U.S.C. § 1132(a)(3)], in which case such relief normally would not be 'appropriate.'"  516 U.S. 489, 515 (1996).  The determination of "appropriate equitable relief" rests with the district court.  See Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76,

19

89-90 (2d Cir. 2001).

Defendant was clearly a fiduciary with respect to Plaintiff's claim for long term disability benefits, as Defendant "'exercise[d] discretionary authority or discretionary control respecting management' of the plan, [and had] 'discretionary authority or discretionary responsibility in the administration' of the plan." Varity Corp., 516 U.S. at 498 (quoting ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A)).

Defendant argues, inter alia, that Plaintiff's claim under section 502(a)(3) must be dismissed because the claim seeks legal relief that is not available under that section and the claim is duplicative of Plaintiff's claim under section 502(a)(1)(B).  However, even reading Plaintiff's complaint liberally as seeking equitable relief that would be available under section 502(a)(3) and that would not be duplicative of Plaintiff's claim under section 502(a)(1)(B), Plaintiff's claim of breach of fiduciary duty must be dismissed.  Plaintiff has failed to present sufficient evidence to show that Defendant breached its fiduciary duty to Plaintiff when Defendant terminated Plaintiff's long term disability benefits.  As discussed supra, the Court concludes that Defendant undertook a thorough review of Plaintiff's appeal and acted within its discretion when it terminated Plaintiff's benefits.  As Defendant acted in accordance with its obligations under ERISA in its determination of Plaintiff's claim for benefits, Defendant did not breach its fiduciary duty when it terminated her benefits.

Moreover, the Court finds that Defendant's alleged failure to provide Plaintiff with her claim file or copies of Dr. Sniger and Dr. Wagner's reports prior to making a final determination of her appeal did not constitute a breach of fiduciary duty.  Letters from Defendant to Plaintiff on October 21, 2003, March 2, 2004, and June 18, 2004 included the provision that Plaintiff was

20

"entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim." AR at 55, 124, 153. Yet there is no indication in the record that Defendant ever denied any request by Plaintiff for documents relevant to her claim, nor does Plaintiff allege such a denial. Therefore, the Court grants summary judgment to Defendant as to Plaintiff's claim for breach of fiduciary duty.

IV.     CONCLUSION

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant's Motion for summary judgment (Dkt. No. 33) is **GRANTED;** and it is further

**ORDERED**, that Plaintiff's Cross-Motion for summary judgment (Dkt. No. 38) is **DENIED;** and it is further

**ORDERED**, that the case is **DISMISSED in its entirety with prejudice**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:      January 23, 2009
            Albany, New York

Lawrence E. Kahn
U.S. District Judge